UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| BARTHOLOMEW BISHOP, | ) | |
| | ) | |
| Plaintiff, | ) | 10 C 4031 |
| | ) | |
| vs. | ) | Judge Feinerman |
| | ) | |
| THOMAS DART, in his official capacity, COOK COUNTY, a municipality, and DR. JONATHAN HOWARD, in his individual capacity, | ) ) ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

In this 42 U.S.C. § 1983 action, Bartholomew Bishop asserts a due process claim against Dr. Jonathan Howard, an equal protection claim against Cook County, and due process and equal protection claims against Cook County Sheriff Thomas Dart in his official capacity. Defendants have moved for summary judgment under Federal Rule of Civil Procedure 56(a). Docs. 72, 76. The motion is denied as to Dr. Howard and granted as to Sheriff Dart and Cook County.

**Background**

Bishop at all relevant times was a pretrial detainee at the Cook County Department of Corrections ("CCDOC"), known colloquially as Cook County Jail. Doc. 83 at ¶ 2. Cook County Jail is operated by the Cook County Sheriff's Department, which is an entity separate from Cook County. *See DeGenova v. Sheriff of DuPage Cnty.*, 209 F.3d 973, 976 (7th Cir. 2000) ("Illinois sheriffs have final policymaking authority over jail operations."); *id*. at 976 n.2 (recognizing that "the Sheriff is an independently-elected constitutional officer" and that "the Sheriff's office has a legal existence separate from the county"). Dart is the Sheriff of Cook County. Doc. 83 at ¶ 3.

Cook County operates Cermak Health Services, an entity that while separate from Cook County Jail provides medical care to its detainees. Doc. 85 at ¶ 3; *see Everett v. Cook Cnty.*, 655 F.3d 723, 725 (7th Cir. 2011); *Boyce v. Moore*, 314 F.3d 884, 887 n.1 (7th Cir. 2002) ("Cermak is a separate entity from CCDOC and an extension of Cook County Hospital."). Dr. Howard was a correctional psychiatrist who worked at Cermak. Doc. 85 at ¶ 4. The following facts are stated as favorably to Bishop as the record and Local Rule 56.1 permit.

### A. Bishop's Medical Treatment

During intake processing at the Jail on October 18, 2009, Bishop informed the examining physician that he suffered from manic depression and had recently attempted to commit suicide. Doc. 85 at ¶ 12. On November 4, 2009, Bishop suffered a seizure and was taken to the emergency room at Cermak Health Services, where he told the treating physician that he was suicidal. *Id*. at ¶ 14. The emergency room physician referred Bishop to two psychiatrists, who placed him on suicide watch. *Ibid*.

On November 5, 2009, Bishop was taken to see Dr. Bharathi Marri; Bishop told Dr. Marri that he felt like killing himself and that he had a plan to do so. Doc. 89 at ¶ 31. Dr. Marri diagnosed Bishop as having Major Depression, prescribed Zoloft and Doxepin, and prescribed as well a paper gown and wool blanket to ensure that Bishop did not try to kill himself. *Ibid*. Due to Bishop's suicidal ideation, Dr. Marri recommended that he be transferred to 2 North, a part of the Jail where he could receive close observation and acute psychiatric care. *Id*. at ¶ 32. On November 6, Dr. Luckose Luke diagnosed Bishop as having Major Depression recurrent. *Id*. at ¶ 33. On November 9, however, Dr. Luke ruled out Major Depression and diagnosed Bishop with Depressive disorder, not otherwise specified. Doc. 87 at ¶ 61. On at least four occasions

between November 10, 2009 and October 12, 2010, Dr. Luke diagnosed Bishop as having Depressive disorder and prescribed Doxepin and Zoloft. *Ibid*.

Dr. Howard first saw Bishop on October 12, 2010. *Id*. at ¶ 62. Bishop told Dr. Howard that he was depressed, and Dr. Howard was aware that Bishop had been prescribed Zoloft and Doxepin. *Ibid*. Dr. Howard suspected that Bishop was fabricating his report of experiencing auditory hallucinations; to determine whether Bishop was malingering or was suffering from Bipolar II, Dr. Howard kept Bishop on the same medications and added Lithium Carbonate. Doc. 85 at ¶ 43. Dr. Howard noted that Bishop had been charged with first-degree murder, and considered this fact in evaluating whether Bishop was malingering. Doc. 87 at ¶ 64. When Dr. Howard saw Bishop again on November 23, 2010, Bishop reported that he was suffering from hallucinations and multiple personality disorder. Doc. 85 at ¶ 45. At that point, Dr. Howard concluded that Bishop was faking his psychosis and ordered that his psychiatric medications be discontinued. *Id*. at ¶ 48. Dr. Howard's diagnosis was consistent with the conclusions of two other psychiatrists, Dr. Christofer J. Cooper and Dr. Jonathon Kelly, who earlier had come to believe that Bishop was malingering. *Id*. at ¶¶ 29, 34.

After Dr. Howard discontinued his medication, Bishop became anti-social, had constant suicidal tendencies, was unable to sleep for any regular period of time, and attempted to commit suicide by cutting his wrist with a shaving razor. *Id*. at ¶¶ 50-51. On December 3, 2010, Bishop was taken to see Dr. Jenea McNeal, a psychiatrist; Bishop told Dr. McNeal that he had been doing well while on the medication and that he could not sleep and felt depressed since Dr. Howard discontinued his medication. *Id*. at ¶ 53. Dr. McNeal diagnosed Bishop with Bipolar disorder and placed him back on his medications. *Id*. at ¶ 56.

### B. Bishop's Housing at Cook County Jail

Bishop initially was housed in Division I of the Jail. *Id*. at ¶ 58. Following his seizure on November 4, 2009, he was moved to tier 3C of Division X. *Ibid*. After a term of segregation in January 2010, Bishop spent two days in Division IX before being moved to tier 4C in Division X ("Fourth Floor"), where he has remained through his confinement. *Ibid*.

Detainees placed on the Fourth Floor are those deemed by medical personnel to require outpatient psychiatric care, while detainees placed on the second floor of Division X ("Second Floor") require an intermediate level of care. *Id*. at ¶ 17 (first ¶ 17). Bishop's treating psychiatrists agree that he was properly placed in outpatient care on the Fourth Floor and that he did not need the more intense psychiatric care offered on the Second Floor. *Id*. at ¶ 17 (second ¶ 17). Detainees on the Fourth Floor "generally" are not entitled to certain services, including group and expressive therapy, that are available on the Second Floor. Doc. 87 at ¶ 59. On December 15, 2010 and January 13, 2011, Bishop was provided group therapy by an expressive therapist. *Id*. at ¶ 66. On November 25, 2010, Bishop filed a grievance requesting that he receive the treatment available on the Second Floor. *Id*. at ¶ 65.

When a Cermak physician determines the level of care a detainee requires, Sheriff's Department employees receive a prescription identifying that level of care. Doc. 83 at ¶ 9. If a detainee's level of care is changed, Sheriff's Department employees are notified that the inmate should be moved to a housing unit corresponding to the new level of care. *Ibid*. The Sheriff's Department must house an inmate in a living unit allocated for the level of care prescribed by Cermak. *Ibid*. If an inmate requests a move to a living unit providing a different level of care, the Sheriff's Department can satisfy the request only if the move is consistent with the level of

medical care prescribed by Cermak medical professionals. *Id*. at ¶ 10; Doc. 74-3 at 19-20 (67:17-70:3).

## Discussion

### I. Deliberate Indifference Claim Against Dr. Howard

Bishop claims that Dr. Howard was deliberately indifferent to his serious medical needs in violation of the Due Process Clause of the Fourteenth Amendment. Bishop was at all relevant times a pretrial detainee at the Jail, not a convicted inmate in the Illinois Department of Corrections. This distinction is irrelevant for purposes of this case: "Although the Eighth Amendment applies only to convicted persons, pretrial detainees … are entitled to the same basic protections under the Fourteenth Amendment's due process clause, and [the court] appl[ies] the same deliberate indifference standard in both types of cases." *Rosario v. Brawn*, 670 F.3d 816, 820-21 (7th Cir. 2012) (internal quotation marks omitted).

To proceed with his claim against Dr. Howard, Bishop must adduce evidence sufficient to permit a reasonable jury to find that Howard "display[ed] deliberate indifference to a serious medical need." *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 301 (7th Cir. 2010). Deliberate indifference has an objective component, that the medical condition be "objectively serious," and a subjective component, that Defendant "acted with a sufficiently culpable state of mind" in that he had "subjective knowledge of the risk to the inmate's health and … disregard[ed] that risk." *Ibid*. (internal quotation marks omitted). Dr. Howard concedes that Bishop has satisfied the objective component for purposes of summary judgment, but contests the subjective component. Specifically, Dr. Howard contends that his diagnosis that Bishop was malingering, which led to his decision to discontinue Bishop's psychiatric medications, did not

reflect a sufficiently culpable state of mind given that his diagnosis was reasonable and supported by the opinions of two other psychiatrists, Drs. Cooper and Kelly.

In most circumstances, a physician can defeat a deliberate indifference claim by showing that other physicians had made the same diagnosis and treatment decisions. *See Sain v. Wood*, 512 F.3d 886, 894-95 (7th Cir. 2008) ("A medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have so responded under those circumstances.") (internal quotation marks omitted); *Collignon v. Milwaukee Cnty.,* 163 F.3d 982, 989 (7th Cir. 1998) (same); *Zackery v. Mesrobian*, 299 F. App'x 598, 601 (7th Cir. 2008) (finding no deliberate indifference where another physician agreed with the defendant's diagnosis of the plaintiff). The law is different, however, when it comes to a diagnosis of malingering. The Seventh Circuit has held that the question whether a physician's treatment decision was based "on a good-faith belief that he was malingering … is an issue for the jury." *Walker v. Benjamin*, 293 F.3d 1030, 1040 (7th Cir. 2002); *see also Greeno v. Daley*, 414 F.3d 645, 655 (7th Cir. 2005) ("The possibility that [the defendants] did not do more for [the plaintiff] because they thought he was malingering and did not really have a severe medical need is an issue for the jury."). *Walker* and *Greeno* defeat Dr. Howard's submission that Bishop cannot satisfy the subjective component of his deliberate indifference claim. It bears mention that other physicians who treated Bishop, including Dr. Marri and Dr. McNeal, did not conclude that he was malingering.

Dr. Howard asserts that he is entitled to qualified immunity. Qualified immunity protects government officials from civil liability if their conduct does not violate clearly established constitutional rights of which a reasonable person would have known. *See McAllister v. Price*,

615 F.3d 877, 881 (7th Cir. 2010). In the context of a claim for deliberate indifference to a detainee's medical needs, analysis of whether the facts (viewed in the plaintiff's favor) establish a constitutional violation and the qualified immunity analysis "effectively collapse into one." *Delgado-Brunet v. Clark*, 93 F.3d 339, 345 (7th Cir. 1996); *see also Walker*, 293 F.3d at 1037 (same); *Herman v. Dodson*, 2012 WL 2119812, at *4 (S.D. Ill. June 11, 2012) (same); *Morrissette v. Ghosh*, 2010 WL 1251443, at *5 n.1 (N.D. Ill. Mar. 23, 2010) (same); *Nelson v. Stover*, 2004 WL 726133, at *7 (N.D. Ill. Mar. 31, 2004) (same). Accordingly, if the record would permit a reasonable jury to conclude that the defendant was deliberately indifferent, then the defendant cannot prevail on qualified immunity grounds. *See Walker*, 293 F.3d at 1037. Because the record would permit a reasonable jury to believe that Dr. Howard was deliberately indifferent, his qualified immunity defense fails.

## II. Deliberate Indifference Claim Against Sheriff Dart

Bishop's official capacity claim against Sheriff Dart alleges that the Sheriff Department's policies and practices resulted in the deliberate indifference to Bishop's serious medical needs. Official capacity claims are governed by the municipal liability standards set forth in *Monell v. N.Y. City Dep't of Social Servs*, 436 U.S. 658 (1978). *See Estate of Sims ex rel. Sims v. Cnty. of Bureau*, 506 F.3d 509, 514 (7th Cir. 2007). To succeed on a *Monell* claim, the plaintiff must show two things: (1) that his constitutional rights were violated; and (2) "that an official policy or custom not only caused the constitutional violation, but was the moving force behind it." *Ibid*. (internal quotation marks omitted). "Unless there is an unconstitutional policy, there cannot be official-capacity liability …." *Id*. at 514-15.

Although Bishop has shown (for summary judgment purposes) that his due process rights were violated, his official capacity claim against Sheriff Dart fails because he cannot demonstrate the existence of an unconstitutional policy or custom. "An official policy or custom may be established by means of [1] an express policy, [2] a widespread practice which, although unwritten, is so entrenched and well-known as to carry the force of policy, or [3] through the actions of an individual who possesses the authority to make final policy decisions on behalf of the municipality or corporation." *Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 675 (7th Cir. 2012); *see also Milestone v. City of Monroe, Wis.*, 665 F.3d 774, 780 (7th Cir. 2011). Bishop pursues the second option, arguing that the Sheriff's Department had a "widespread" practice of exhibiting deliberate indifference to inmates' medical needs. The general rule holds that a plaintiff pursuing this option must adduce proof of "more than one instance, or even three" of misconduct. *Thomas*, 604 F.3d at 303 (internal citation omitted); *see also Gable v. City of Chicago*, 296 F.3d 531, 538 (7th Cir. 2002) ("three incidents were too few to indicate that the City had a widespread custom of which City policymakers had reason to be aware"). Bishop identifies only one instance of alleged misconduct, the one involving himself.

Implicitly acknowledging this problem, Bishop maintains that a single instance of misconduct can suffice in certain cases. Bishop is right about the law, as "[t]he Supreme Court has expressly acknowledged that evidence of a single violation of federal rights can trigger municipal liability if the violation was a 'highly predictable consequence' of the municipality's failure to act." *Woodward v. Corr. Med. Servs. of Ill., Inc.*, 368 F.3d 917, 929 (7th Cir. 2004) (quoting *Bd. of Cnty. Commr's of Bryan Cty. v. Brown*, 520 U.S. 397, 409 (1997)). In *Connick v. Thompson*, 131 S. Ct. 1350 (2011), however, the Court cautioned that the exception must be

cabined to a "narrow range," with the prototypical example being "a city that arms its police force with firearms and deploys the armed officers into the public to capture fleeing felons without training the officers in the constitutional limitation on the use of deadly force." *Id*. at 1361 (citing *City of Canton v. Harris*, 489 U.S. 378, 390 n.10 (1989)).

Bishop's claim does not fall within that narrow range. He maintains that deliberate indifference to his serious medical needs was the predictable consequence of Sheriff Dart's practice of being unaware of detainees' mental health needs, which in turn led to detainees being housed on the Fourth Floor when they should have been housed on the Second Floor. Doc. 82 at 8-10. The record indisputably refutes Bishop's argument. The Sheriff's Department was not unaware of detainees' mental health needs; rather it delegated to Cermak medical professionals the diagnosis of detainees and then relied on Cermak's diagnoses to make medical-related housing decisions. It is entirely appropriate for jail officials to rely on medical professionals to determine the medical needs of detainees. *See Johnson v. Doughty*, 433 F.3d 1001, 1012 (7th Cir. 2006) ("A non-medical prison official … cannot be held deliberately indifferent simply because [he] failed to respond directly to the medical complaints of a prisoner who was already being treated by the prison doctor.") (internal quotation marks omitted); *Arnett v. Webster*, 658 F.3d 742, 755 (7th Cir. 2011) (same); *Greeno*, 414 F.3d at 656 (same). Bishop therefore cannot invoke the "single incident" exception to the general rule governing "widespread" practice Monell claims. *See Calhoun v. Ramsey*, 408 F.3d 375, 380-81 (7th Cir. 2005); *Arlotta v. Bradley Ctr.*, 349 F.3d 517, 522-23 (7th Cir. 2003); *Palmer v. Marion Cnty.*, 327 F.3d 588, 596 (7th Cir. 2003).

**III.     Equal Protection Claim Against Sheriff Dart and Cook County**

Bishop's equal protection claim against Dart and Cook County, also governed by *Monell*, alleges that they denied him the psychiatric treatment afforded to similarly situated detainees housed on the Second Floor.  The parties agree that this is a "class of one" equal protection claim.  Unlike a traditional equal protection claim, "[a] class-of-one claim need not allege discrimination based on a suspect classification, but must allege that the plaintiff was singled out arbitrarily, without rational basis, for unfair treatment."  *Abcarian v. McDonald*, 617 F.3d 931, 938 (7th Cir. 2010); *see also United States v. Moore*, 543 F.3d 891, 896 (7th Cir. 2008) (same).  Like other equal protection plaintiffs, a class-of-one plaintiff must show that he was "intentionally treated differently from others similarly situated."  *McDonald v. Vill. of Winnetka*, 371 F.3d 992, 1001 (7th Cir. 2004).

In *Del Marcelle v. Brown Cnty. Corp.*, 680 F.3d 887 (7th Cir. 2012) (en banc), the Seventh Circuit unsuccessfully attempted to settle on a standard governing class-of-one claims.  The differences among the three competing standards articulated in *Del Marcelle* are irrelevant here because no reasonable jury could find that Bishop was intentionally treated differently from others similarly situated, which is an element common to all three standards.  *See id*. at 897-99 (opinion of Posner, J.); *id*. at 902-03 (opinion of Easterbrook, C.J.); *id*. at 911-14 (opinion of Wood, J.); *see also Thayer v. Chiczewski*, __ F.3d __, 2012 WL 4074417, at *14 (7th Cir. Sept. 18, 2012) (while recognizing that "the class-of-one standard in this circuit is in flux," holding that a class-of-one plaintiff "must show that he was intentionally treated differently from other similarly situated individuals and that there was no rational basis for this difference in treatment"); *Jordan v. Cockroft*, 2012 WL 3104876, at *2 (7th Cir. Aug. 1, 2012) (holding, post-

*Del Marcelle*, that "[a]n equal-protection claim brought by a 'class of one' can succeed only if the plaintiff proves that he has been intentionally treated differently from others similarly situated and that there is no rational basis for the different treatment").

To satisfy the "similarly situated" component of his class-of-one claim, Bishop must establish that he and the Second Floor detainees were "*prima facie* identical in all relevant respects," *Purze v. Vill. of Winthrop Harbor*, 286 F.3d 452, 455-56 (7th Cir. 2002), or "directly comparable … in all material respects," *Ajayi v. Aramark Bus. Servs., Inc.*, 336 F.3d 520, 532 (7th Cir. 2003) (internal quotation marks omitted). This he cannot do. It is undisputed that Cermak medical staff determined that Bishop needed only outpatient treatment, not intermediate care, and that this determination led to Bishop being housed on the Fourth Floor. Bishop contends that he was similarly situated to the Second Floor detainees because he received group therapy on two occasions. However, although group therapy is "generally" restricted to detainees requiring intermediate care, Doc. 87 at ¶ 59, nothing in the record supports Bishop's premise that group therapy is provided *only* to such detainees or that a detainee who receives group therapy automatically is classified as needing intermediate care. Bishop's argument, and thus his attempt to satisfy the "similarly situated" component of his claim, therefore fails. Moreover, even if Bishop had cleared that hurdle, no reasonable juror could find on this record that classifying him as requiring only outpatient care resulted from his being "singled out arbitrarily, without rational basis, for unfair treatment." *Abcarian*, 617 F.3d at 938.

Because Bishop cannot demonstrate that his equal protection rights were violated, there is no need to address whether he has shown an unconstitutional policy or custom. That said, Bishop's claim fails on this ground as well. The record indisputably shows that detainees

classified as needing intermediate care received more treatment than those classified as needing outpatient care, and that detainees were housed according to their designated level of care. At most, Bishop's claim is that individual prison officials implemented this constitutional policy in an unconstitutional manner. That is insufficient to make out a *Monell* claim.

The point is illustrated by *Rasche v. Vill. of Beecher*, 336 F.3d 588 (7th Cir. 2003), where the plaintiffs' *Monell* claim concerned a zoning ordinance regarding signs and an adjudicatory ordinance establishing procedures to enforce the zoning ordinance. The *Rasche* plaintiffs did not contend that either ordinance was "unconstitutional or represents unconstitutional policies." *Id*. at 599. Instead, they argued that "the ordinances, although not unconstitutional in themselves, have caused a constitutional violation" because they were enforced in an unconstitutional manner by village officials. *Ibid*. The Seventh Circuit rejected that argument, reasoning that "[i]n order for a § 1983 plaintiff 'to establish municipal liability on the theory that a facially lawful municipal action has led an employee to violate a plaintiff's rights,' the plaintiff 'must demonstrate that the municipal action was taken with "deliberate indifference" as to its known or obvious consequences.'" *Ibid*. (quoting *Bryan Cnty*., 520 U.S. at 407). The court concluded that because the plaintiffs did not articulate how the obvious consequence of the municipality's policy would be a violation of plaintiffs' rights, their *Monell* claim failed as a matter of law. *Ibid*.

Bishop's equal protection claim fails for the same reason. He does not and could not articulate how of Cook County's and Sheriff Dart's policy to provide patients needing intermediate care with additional treatment had the obvious consequence of Cermak and Jail employees implementing the policy to violate his equal protection rights. It follows that Cook County and Sheriff Dart are entitled to summary judgment on the equal protection claim. *See*

*Waters v. City of Chicago*, 580 F.3d 575, 581 (7th Cir. 2009) ("Misbehaving employees are responsible for their own conduct; units of local government are responsible only for their policies rather than misconduct by their workers.") (internal quotation omitted).

## Conclusion

For the foregoing reasons, summary judgment is denied as to the claim against Dr. Howard and is granted as to the claims against Sheriff Dart and Cook County. Bishop's claim against Dr. Howard will proceed to trial.

October 3, 2012

_____
United States District Judge